**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **PARK RIDGE SPORTS, INC.,** | ) | |
| **an Illinois Not For Profit Corporation,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 20 C 2244** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **PARK RIDGE TRAVEL FALCONS,** | ) | |
| **an Illinois Not For Profit Corporation,** | ) | |
| ***et al.,*** | ) | |
| | ) | |
| **Defendants.** | ) | |

## REPORT AND RECOMMENDATION

As though a pandemic, looting, and civil unrest were not enough, battle has broken out among the youth football fathers of the Chicago suburb of Park Ridge. On one side of the line of scrimmage, is the plaintiff, Park Ridge Sports. On the other side, stand the defendants, the Park Ridge Travel Falcons. The battle is, from review of the parties' submissions, no doubt a personal rivalry. But for our purposes, in federal district court, it takes the form of a dispute over the trademark rights to the team name, "Falcons" and accompanying logo.

## PREGAME

The name and logo are, of course, familiar to even a casual professional football fan, as the plaintiff copied them exactly from the NFL's Atlanta Falcons, which came on the scene about 50 years ago. *Cf.* 15 U.S.C. §. 1052(d)("No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it– . . . Consists of or comprises a mark which so resembles a mark

registered in the Patent and Trademark Office, or a mark or trade name previously used in the United States by another and not abandoned, as to be likely, when used on or in connection with the goods of the applicant, to cause confusion, or to cause mistake, or to deceive . . . ."). Then, more recently, no slouches in the lack of creativity and originality department, the defendants copied it from the plaintiffs. The defendants went a step further than the plaintiff ever managed to in the fifty years they claim to have been using these marks and applied for trademarks with the USPTO on PARK RIDGE FALCONS (word mark) – U.S. Serial No. 88/850,739; PRIVILEGED TRAVEL FALCONS (word mark) – U.S. Serial No. 88/850,719; and PARK RIDGE TRAVEL FALCONS and Design – U.S. Serial No. 88/850,573, on March 27, 2020. The plaintiffs filed suit a couple of weeks later, on April 9th, under Section 43(a) of the Lanham Act, and the Illinois Deceptive Trade Practices Act. The plaintiffs filed a motion for a preliminary injunction on June 23, 2020 [Dkt. #42] and Judge Guzman referred the motion to me for a report and recommendation the next day. [Dkt. #44].

The parties both declined to have a hearing when I had an initial status on this matter on July 2nd. Predictably, once those affidavits came in – and defendants' shed doubt on the plaintiff's – plaintiff had a change of heart and decided a hearing might be a good idea [Dkt. # 53, at 2], or not. [Dkt. #53, at 3]. But, then on August 6th, over the telephone, both parties *again* eschewed a hearing, preferring to leave the matter to the papers. [Dkt. #54]. All in all, it's hard to tell where plaintiff stands on this, as well as on more than just a couple of other points, as will be seen. There is a vagueness to plaintiff's presentation that is either purposeful or sloppy. But in either case, it counsels against disrupting the *status quo* at this late point and entering a preliminary injunction.

In any event, we are left with a battle of affidavits. It's not uncommon for a preliminary injunction to be resolved on the basis of affidavits. Affidavits are ordinarily inadmissible at trials but

they are fully admissible in summary proceedings, including preliminary-injunction proceedings. *Goodman v. Illinois Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 439 (7th Cir. 2005); *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1171 (7th Cir. 1997). Ordinarily the party seeking a preliminary injunction is in a hurry; they are claiming they will be irreparably harmed without one, after all. And, of course, the hulking defensive tackle in the room is the coronavirus. Is it necessary to have a hearing with multiple witnesses in the midst of a pandemic which, by last reckoning, appears to be getting worse in this area? All over the name and logo of a youth football program? A name and logo that is not original to plaintiff or defendants? The clear answer is no, so this little squabble among the football fathers will be taken care of in responsible fashion.

Because preliminary injunction proceedings are designed to move at a speed the bar and the courts are neither comfortable nor familiar with, there is little time to collect evidence and conduct discovery, which ordinarily moves at a glacial pace. Here, however, the plaintiff seemed in not so much of a hurry. They filed their lawsuit back on April 9, 2020, and did not move for injunction relief until three months later. In those three months, they managed to put together affidavits from James Toulon, president of plaintiffs' board of directors; Matt Colleran, a member of their board; and Mel Thillens, another member of their board of directors. Now certainly, the coronavirus may have had some dampening effect on the fire of plaintiff's efforts, but plaintiff was certainly not short-staffed: they have *six attorneys* assigned to this case. That's effectively a "jailbreak," an all-out blitz. It inspires flash-backs to Dan Pastorini and the invention of the quarterback flackjacket. The type of evidence one tends to find in Lanham Act cases – marketing reports, surveys, sales records, etc. – is not the type of evidence that requires person-to-person contact.

In any event, once the plaintiffs did file their Motion for a Preliminary Injunction, Judge

Guzman referred it to me for a Report and Recommendation the next day. [Dkt. #44]. That meant, once the parties briefed the matter, and once I considered those filings and issued my Report and Recommendation, there would be an automatic delay of *at least another month* and, most likely, more. Under Fed.R.Civ.P. 72(b)(2), parties have 14 days to file objections to Reports and Recommendations on matters like preliminary injunctions. The other party then gets and additional 14 days to respond. After that month has passed, the District Judge must then must consider the objected-to portions of the report and recommendation *de novo*, and must review the remainder of the Report and Recommendation for clear error. *White v. Sloop*, 772 F. App'x 334, 337 (7th Cir. 2019). It is a lengthy process. Thus, in making his referral, Judge Guzman may have considered plaintiffs' leisurely pace as some indication that there was not much of an emergency here. In effect, Judge Guzman may well have weighed in on the issue of irreparable harm. But quite apart from that, it is my recommendation that the Motion for Preliminary Injunction be denied.

## FIRST HALF

That being said, we move to the facts of this dispute which, as already noted, are a bit murkier than one might expect. Mr. Toulon is plaintiff's central (paper) witness. He claims that plaintiff has offered a variety of youth sports program to the Park Ridge community, including flag and tackle football, and cheerleading, since 1967. (Touolon Dec., ¶ 3). He also claims that the youth tackle football program has operated continuously all that time under the trade name and service mark Park Ridge Falcons. (Id., ¶ 4). It's not clear how he knows this, as he tells us he has only been associated with the plaintiff's program since only 2017. (Id., ¶ 2). *Cf. Shaffer v. Lashbrook*, 962 F.3d 313, 317 (7th Cir. 2020)(even a self serving affidavit has evidentiary value if it is based on personal

knowledge).[1] But, more confusingly, Mr. Toulon says that, in 2019, plaintiffs fielded *thirteen* teams within *two* leagues, *all* under the name Park Ridge Falcons. (Id., ¶ 5). There's no indication of how that works. Thirteen teams all with the same name? Apparently whenever a young man looks at his schedule his Park Ridge Falcons are playing . . . the Park Ridge Falcons. That's a confusing assertion, and there's probably a reason for that, as it can't possibly be accurate.

Plaintiff's counsel has chosen to support Mr. Toulon's Declaration with a Chicago Tribune article about Park Ridge youth football. The article states that, prior to 2015, there were two separate youth football programs: the traveling Park Ridge Falcons team and Park Ridge Youth Football. [Dkt. #42-14 ("The two programs date back decades in the city. Both the Falcons and Park Ridge Football merged earlier this year [2015] under the Park Ridge Sports, Inc. banner.")]. Furthermore, the article the plaintiff submits gives every indication that plaintiffs run, and have run, a house league, and the Park Ridge Falcons run – or ran – a separate more competitive traveling team. [Dkt. #42-14 ("With the high school season kicking off, more than 500 members of the traveling Park Ridge Falcons and the Park Ridge Football house leagues are gearing up for their own season as well. . . . The youngest athletes play flag football in Park Ridge Football's house league before moving on to tackle football at around age 8. They also have the option of trying out for the Falcons, who play teams from other communities.")].

So if, as it appears from plaintiff's own submissions, that the two programs, Park Ridge Sports and the Park Ridge Falcons, merged only a couple years ago, what happened all of a sudden

---

[1] This is not to say that "self-serving" is a valid objection. It is not. *McKinney v. Office of the Sheriff of Whitley County*, 866 F.3d 803 (7th Cir. 2017)(self serving not a basis for rejecting affidavits on summary judgment). *See also* Jeffrey Cole, The Seventh Circuit Inters "Self-Serving" as an Objection to the Admissibility of Evidence, The Circuit Rider, 14 (November 2013).

this year? Mr. Toulon explains that interest in youth football has waned. In reaction, plaintiffs decided to "combine two of its Park Ridge Falcons youth football program leagues into a single league. As a result of this decision, the Park Ridge Falcons league previously directed by defendant Kilburg was combined with a larger Park Ridge Falcons league." (Toulon Dec., ¶¶ 9-10). The vote on that went 8-4. (Id.). Mr. Toulon doesn't tell us when this was, or what these "two . . . youth football program leagues" were before. Was this a folding of a competitive traveling team level with a less competitive participatory level? Was it due the lack of participation in the traveling team? Or money? Was it perhaps Covid-19 related? Plaintiff, again, keeps the details sketchy, which certainly detracts from believability. Sketchiness and obfuscation are not hallmarks of credibility. *See, e.g., First Union Rail Corp. v. Heller Performance Polymers, Inc.*, 2007 WL 4224341, at *3 (N.D. Ill. 2007); *F.T.C. v. QT, Inc.*, 448 F. Supp. 2d 908, 917 (N.D. Ill. 2006); *United States v. Hampton*, 2004 WL 2806337, at *2 (N.D. Ill. 2004).

In any event, three members of the plaintiffs' board of directors – Purcell, Walbert, and Karnezis – along with one of the coaches for one of plaintiff's 2019 Park Ridge Falcons teams – presumably the traveling team – Kilburg, mutinied and formed defendant, Park Ridge Travel Falcons. (*Id.*, ¶ 10). They even went plaintiff several yards better, and purchased a website, www.prtravelfalcons.com, and filed three federal trademark applications for registration of the marks Park Ridge Falcons, Park Ridge Travel Falcons and PRIVILEGED Travel Falcons, United States Serial Nos. 88/850,739, 88/850,719, and 88/850,573. [Dkt. # 19, ¶¶ 27, 31-34].

We also know from plaintiff's submissions that defendants have associated themselves with Pop Warner, and play teams from all over the northern part of Illinois – and "the Region" in Indiana – from Freeport in the west to Hammond in the east, and from Algonquin in the north to Kankakee

in the south. [Dkt. #42-8]. Pop Warner and a schedule that sweeps from the Wisconsin border into Indiana is very different from a local Park Ridge house league. But, again, plaintiffs tell us little about how their league of thirteen "Falcons" teams is set up, where they play, who they play, etc. (Toulon Dec., ¶. 4). Indeed, at this point, plaintiff will not be offering any type of traveling or in-house tackle football team, while defendants have gone so far as to set up practices in Crown Point, Indiana, in order to avoid the State of Illinois' Covid-19 restrictions.

Defendants, of course, offer their own set of affidavits and, in terms of allowing the court to see the gridiron and learn the roster in this game, the affidavit from James Purcell is far more detailed than Mr. Toulon's. Where Mr. Toulon's story leaves one to scratch their head and wonder what exactly is going on, Mr. Purcell's provides the proverbial lightbulb and sheds some light on the narrative plaintiff preferred to keep in the dark. Mr. Purcell tells us that he has been involved in Park Ridge football as a coach since 2014. He explains that, prior to 2015, the city of Park Ridge, Illinois had two, separate youth football programs: 1) the "Division l" travel youth football program known as the "Falcons"; and 2) Plaintiff's "Division 2" house football program, which consisted of numerous teams that played against one another. (Purcell Aff., ¶. 3).

Mr. Purcell continues, explaining that the Division 1 team – which he says was always known as the Falcons – required a higher playing level. It was limited to older children from sixth to eighth grade, who had to try out to make the team. Players could be cut from the team based on level of play. Practices were longer and tougher. The officials and coaching staff were more experienced. Participation cost the parents more money and more time. The Division 1 Falcons was a traveling team that played against other, more competitive teams throughout the region. It was a prep team, or feeder program, designed to hone the talents of skilled middle school football players in

preparation of competitive play in high school. (Purcell Aff., ¶. 4).

Mr. Purcell goes on the tell us that the Division 2 house league was for less competitive players to allow everyone who wanted to play football an opportunity to participate. The Division 2 house league consisted of around four to eight teams that played against one another. Those Division 2 teams used various team names, but the name "Falcons" was always associated with the Division 1 travel team, not the Division 2 house league. Division 2 house players did not have tryouts, were not cut from teams, practiced less often, had less stringent officiating and coaching, required less parental involvement, and required less of a financial commitment. (Purcell Aff., ¶. 5).

In or around 2015, the Division 1 travel team, the Falcons, and the Division 2 house league decided to join forces. While the two programs were being operated side-by-side, the Division 1 travel team still continued to use the Falcons name, while the Division 2 house league continued to use various different names, mostly from the NFL, and play against one another. Although the two programs merged, it was always the intention of the parties that the Division 1 travel team would continue to use the Falcons name. (Purcell Aff., ¶. 6).

That's all replay; Mr. Purcell then gets us back to live action. In the Spring of 2020, plaintiff decided to fold the Division 1 travel team into the Division 2 house team, effectively eliminating the traveling team. While plaintiff sought to keep the Falcons name for the Division 2 house league – it's still not clear how that would work – Mr. Purcell claims that when the Division 1 travel team and the Division 2 house team originally combined, it was always the intention that the Division l travel team be known as the Falcons. (Purcell Aff., Par.7).

Defendants also submit an affidavit from James Brander, who tells us he has been involved with Park Ridge youth football since 2010, and as a coach from 2010 through 2016. He explains

that, prior to 2015, the plaintiffs – Park Ridge Sports – offered no travel football team, only a house league. (Brander Aff., Par. 7). The Park Ridge Falcons, on the other hand, were the community's youth travel team, operating independently since the 1970s until 2015. (Id., Par. 8). This was the competitive, elite level. There were tryouts. The only concession to hurt feelings was a "minimum plays" level; once a boy made the team, he got to play a minimum number of snaps in a game. (Id., Pars. 8-9). So Mr. Purcell's version, and Mr. Brander's version both track much more closely with the Chicago Tribune article attached to Mr. Toulon's declaration.

The affidavit scrimmage between Mr. Touolon and the double coverage of Mr. Purcell and Mr. Brander is arm-tackling compared to the slobberknocker helmet-to-helmet hitting when we get to the affidavits from Mel Thillens (on plaintiffs' side of the line) and Mark Sroka (on defendants' side). Mr. Thillens – on plaintiffs' board of directors – relates a phone conversation he had with Mr. Sroka in which Mr. Sroka asked about being more involved with plaintiffs' flag football program. Mr. Thillens, knowing that Mr. Sroka was involved with the Travel Falcons, asked whether it was all right if Mr. Sroka had a foot in both camps. Mr. Thillens tells us that Mr. Sroka indicated to him that the Travel Falcons were part of plaintiffs' program. (Thillens Dec.. Pars. 3-5). But, Mr. Sroka calls Mr. Thillens a liar. Mr. Sroka says he had no phone conversation with Mr. Thillens on June 22, 2020. (Sroka Aff., Par. 5). And, he submits that he was fully aware of the differences between the Park Ridge Travel Falcons and the Park Ridge Football program. (*Id.*, Pars. 6-7).

Mr. Thillens keeps hitting, though, right up to the echo of the whistle. He comes back in plaintiff's reply brief submissions to explain that the date he gave for the conversation – June 22, 2020 – was a "typographical error", and the conversation he referenced actually took place on May 27, 2020. [Dkt. #53, at 5; #53-1]. So, plaintiff argues, when Mr. Sroka says he didn't have a

conversation with Mr. Thillens on June 22nd, that doesn't mean he didn't have one on May 27th, or didn't have one at all. [Dkt. #53, at 5]. That's a good point, as Mr. Sroka is pretty specific that "*as of June 22, 2020*, [he] was fully aware of the differences between the Park Ridge Travel Falcons program, and the Park Ridge Football program . . . ." [Sroka Aff., Par. 6 (emphasis added)]. What Mr. Sroka knew before June 22nd, we don't know. On the other hand, "June 22" is not a typical typo for "May 27". Plaintiff piles on after the whistle, accusing defendants' counsel of ethical violations and threatening Rule 11 charges.

Then, there is Matt Colleran, also a member of plaintiff's board. He comes up with a couple of emails from his wife. Someone from the Maine Eagles – a youth wrestling program – sent her a link to a Chicago Tribune article about this lawsuit and asked, "Are we promoting the right P[ark] R[idge] team?" Mr. Colleran's wife than forwarded it to him, tagging it with: "Another confusion." [Dkt. #42-17]. Another email to his wife from one of her friends, Kelli Harman, asked whether she was supposed to be signing her son up on the Park Ridge Football site or the Park Ridge Travel Falcons site. [Dkt. #42-18].

Finally, plaintiff added a few more emails, sent to the vice president of its board, Roy Hoffman, along with its reply brief. [Dkt. #53-8]. The first is from a mom requesting a refund: "I am writing to request a refund of the registration for my son, in the amount of $325. I mistakenly signed up for the wrong league." Another was from a dad who expressed some surprise that Park Ridge Sports football hadn't been cancelled, and when Mr. Hoffman told him it would only be flag football, he asked about the tackle football program he heard about that was playing over the border in Crown Point, Indiana. Another was from another mom who said: "I signed up my three kids for cheer, flag football and tackle. I believe I signed up my son for the wrong Falcons teams. He was interested in

pop warner falcons(I'm confused) with this, it's my first year."  Then from another dad:  Wanted to

ask about his younger brother in 7th grade, I understand you are coaching the PRIVILEGED travel

team. Are you guys playing tackle in Crown Point this year?" Again, Mr. Hoffman had to explain that

plaintiff didn't have tackle football this Fall, due to the Governor's coronavirus guidelines.  Finally,

another dad wrote after taking his son to a preview session for plaintiff's program; they had wanted

to play tackle football in the program coached by defendant, Mr. Kliburg.  [Dkt. ##53-2-53-8].When

distilled down to their essence, the emails plaintiff has submitted show that there is a group of parents

used to traveling team tackle football, that they want their sons in that program, and that plaintiff can

no lomger accommodate them.  And, it is rather clear that those parents don't care if the team is

called Falcons or Martians, and are not as concerned about Covid-19 as other parents.

## SECOND HALF

### Preliminary Injunction Standards

A party moving for preliminary injunctive relief need not demonstrate a likelihood of absolute

success on the merits. Instead, he must only show that his chances to succeed on his claims are 'better

than negligible.' *HH-Indianapolis, LLC v. Consol. City of Indianapolis & Cty. of Marion, Indiana*,

889 F.3d 432, 437 (7th Cir. 2018); *Valencia v. City of Springfield, Illinois*, 883 F.3d 959, 966 (7th

Cir. 2018). Although "[t]his is a low threshold," *id.*, it "does not mean ... that applicants for interim

injunctive relief with relatively weak cases will always obtain injunctions." *Valencia*, 883 F.3d at 966;

*Sofinet v. INS*, 188 F.3d 703, 707 (7th Cir. 1999).  "A preliminary injunction is an 'extraordinary and

drastic remedy.' It should never be awarded as of right."  *Munaf v. Geren*, 553 U.S. 674, 689-90

(2008). It should only be granted when the movant, "by a clear showing, carries the burden of

persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  "If it is plain that the party seeking

the preliminary injunction has no case on the merits, the injunction should be refused regardless of the balance of harms." *Valencia,* 883 F.3d at 966.

If the moving party gets past this initial threshold, it must then show that: (1) it will suffer irreparable harm in the period before the resolution of its claim; and (2) traditional legal remedies are inadequate. *HH-Indianapolis,* 889 F.3d at 437; *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). If the party makes the necessary showings, the court moves to the "balancing phase." *Id.* At that phase, the court employs a sliding-scale approach and "weighs the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to other parties or the public is sufficiently weighty that the injunction should be denied." *BBL, Inc. v. City of Angola*, 809 F.3d 317, 324 (7th Cir. 2015); *HH-Indianapolis*, 889 F.3d at 437.

Like much of the law, this preliminary injunction analysis is inexact and hardly a science. Motions for preliminary injunctions call upon courts to make judgments despite uncertainties. *Planned Parenthood of Indiana & Kentucky, Inc. v. Adams*, 937 F.3d 973, 980 (7th Cir. 2019). As the Seventh Circuit has conceded:

> The weighing and balancing of these competing interests with any precision are not feasible undertakings in a preliminary-injunction proceeding, and probably not in a full trial either. Imponderables are likely to dominate. About all that is feasible at the preliminary-injunction stage is for the judge to estimate the likelihood that the plaintiff will prevail in a full trial and which of the parties is likely to be harmed more by a ruling, granting or denying a preliminary injunction, in favor of the other party, and combine these findings in the manner suggested in such cases as *Abbott Laboratories v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir.1992): "the more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side.

*Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc.*, 735 F.3d 735, 740 (7th

Cir. 2013).

## Trademark Law

While the plaintiffs never registered their purported trademark, even an unregistered mark may still be enforceable under § 43(a) of the Lanham Act, which creates a federal cause of action for trademark infringement. *See Matal v. Tam*, – U.S. –,–,137 S. Ct. 1744, 1752 (2017); *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 768 (1992)("Section 43(a) prohibits a broader range of practices than does § 32, which applies to registered marks, but it is common ground that § 43(a) protects qualifying unregistered trademarks" (internal quotation marks and citation omitted)). Because the mark is unregistered, plaintiffs bear the burden of establishing that the mark is entitled to protection. *Baig v. Coca-Cola Co.*, 607 F. App'x 557, 559–60 (7th Cir. 2015). Plaintiffs argue that it has established that it has used the PARK RIDGE FALCONS mark in commerce for more than 50 years by operating a program that competed both within Illinois and in various other states. They rely exclusively on Mr. Toulon's Declaration. [Dkt. #42-1, at 9]. Although by the time plaintiff filed its Reply Brief, it whittled that claim down to having used the name since 2015. [Dkt. #53, at 3]. Much of plaintiff's case presents a moving target, making it difficult to assess. Piling on top of that is the fact "trademark law's hallmarks are doctrinal confusion, conflicting results, and judicial prolixity." *HMH Publishing Co. v. Brincat*, 504 F.2d 713, 716 (9th Cir.1974). *See also TMT N. Am., Inc. v. Magic Touch GmbH*, 124 F.3d 876, 884 (7th Cir. 1997).

A trademark is "an identifier rather than a property 'right,' " *Dorr–Oliver, Inc. v. Fluid–Quip, Inc.*, 94 F.3d 376, 380 (7th Cir.1996), and trademarks are thus protected only to the extent that they give consumers information about the origin or quality of products. *TMT N. Am.*, 124 F.3d at 882. (7th Cir. 1997). That salient point is what the real problem is here. Distilling everything the parties

have submitted down to the essence, it does not seem that "Falcons" identifies much of anything – it's Park Ridge that is the name of the programs. The confusion, if any, seems to be fueled by the fact that there are now two football programs in Park Ridge. It doesn't matter much if both are called Falcons, because both are called Park Ridge. "The principle underlying trademark protection is that distinctive marks—words, names, symbols, and the like—can help distinguish a particular artisan's goods from those of others." *B & B Hardware, Inc. v. Hargis Industries, Inc.*, 575 U.S. ——, ——, 135 S.Ct. 1293, 1299 (2015). An identifying mark is distinctive and capable of being protected if it either (1) is inherently distinctive or (2) has acquired distinctiveness through secondary meaning. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769 (1992).

The mark, "Falcons" is arbitrary because it does not describe or convey the nature of the services of organizing and conducting a youth football program. An arbitrary mark enjoys full trademark protection without proving secondary meaning. But the record – including the emails plaintiff has recently submitted – gives every indication that "Falcons" does not identify plaintiff's program, it identifies the community's traveling tackle football program; a program plaintiff no longer offers and one that was merged with plaintiff's programs for only a brief period from 2015 to 2019.

Be that as it may, the analysis moves on to the likelihood of confusion. Seven factors comprise the likelihood of confusion test: "(1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of complainant's mark; (6) actual confusion; and, (7) intent of defendant to 'palm off his product as that of another.' " *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1043–44 (7th Cir. 2000). *See also Promatek Indus., Ltd. v. Equitrac*

*Corp.*, 300 F.3d 808, 812 (7th Cir. 2002); *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 898 (7th Cir. 2001).The likelihood of confusion test is an equitable balancing test. As a consequence, the "weight and totality of the most important factors in each case will ultimately be determinative of the likelihood of confusion, not whether the majority of the factors tilt the scale in favor of one side or the other." *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 812 (7th Cir. 2002); *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 898 (7th Cir. 2001).

While no single factor is dispositive, and courts may assign varying weights to each of the factors in different cases, three of the factors are particularly important: the similarity of the marks, the defendant's intent, and actual confusion. *Barbecue Marx*, 235 F.3d at 1044 (7th Cir. 2000). In the end, however, unless a judge is the parent of a boy interested in playing highly competitive, traveling team, tackle football, "a judge's finding that confusion [is] likely [is] nothing but a surmise, a conjecture, a guess." *Kraft Foods Grp.*, 735 F.3d at 741–42.

**Similarity of marks.** There is little doubt that the marks are similar. They are both copies of the NFL franchise's team name and logo. But, the defendants point out that their mark is actually "Travel Falcons" as opposed to just "Falcons." Plaintiff calls that a slight difference but, in this context it is rather significant. There is a huge difference to parents and their sons between a house league – that's what plaintiff offers, and this Fall it's flag football – and a traveling tackle football team. This factor doesn't really tip one way or the other, but certainly doesn't favor plaintiff's motion for an injunction.

**Similarity of products.** Both plaintiff and defendants offer youth football programs, but that is where the similarity ends. As already said, there is a very significant difference between a house league – one where, as plaintiffs say, anyone can play – and a traveling team. A traveling team like

defendants plays other traveling teams form other communities. Places on the team are not guaranteed, tryouts are competitive. The difference is summed up in that the scene from "Remember the Titans" where Denzel Washington explains to his young charges that, at this level, "football . . . [isn't] fun anymore, not even a little bit." While plaintiff's presentation attempts to disguise this very salient distinction by suggesting it still offers a travel tackle football team, that's just not true. The parties offer two very different things and their participants have two very different expectations and experiences. The similarity of products – they aren't similar at all – weighs against an injunction.

**Area and Manner of Concurrent Use.** The defendants' program is, as already indicated, far-reaching, playing teams from the Wisconsin border through Northern Illinois and over the Indiana border. Plaintiff's program is limited to Park Ridge and, perhaps, a couple of neighboring communities but, again, plaintiff's submissions are sketchy on that point. Area and manner of concurrent use are sufficiently different to weigh against an injunction.

**Degree of Care Used by Consumers.** Plaintiff's protestations to the contrary aside, parents of youth football players are likely to employ a high level of discernment in deciding whether their sons play in a house league or on a traveling team. That these are two very different levels of competitiveness and commitment is very likely well known to parents. When one adds in the additional considerations parents must engage in now that we know so much more about football and the dangers of Chronic Traumatic Encephalopathy (CTE), this would seem to be a group of consumers that goes through a great deal of mulling before making such a significant decision regarding their children. One would hope so, anyway. As such, it seems most parents would likely know the difference between a competitive traveling team and a fun house league team; parents of potential football players would *definitely* know. The parents who sent emails to plaintiff's Mr.

Hoffman had no intention of ever signing their sons up for a house league or a flag football league. They wanted tackle football for their boys; they wanted the team that practiced in Indiana in order to avoid the Covid-19 safeguards Illinois has in place. One might question their judgment, but it cannot be said that they don't care which product they are signing their sons up for.

**Strength of Mark.** The 'strength' of a trademark refers to the mark's propensity to identify the products or services sold as emanating from a particular source. *Sorensen v. WD-40 Co.*, 792 F.3d 712, 731 (7th Cir. 2015); *CAE*, 267 F.3d at 684. A mark's strength ordinarily corresponds to its economic and marketing strength. *Sorensen v. WD-40 Co.*, 792 F.3d 712, 731 (7th Cir. 2015); *AutoZone*, 543 F.3d at 933. Plaintiff claims that Park Ridge Falcons has been used by Plaintiff in connection with organized youth programs for over 52 years, has been recognized as one of the top youth football programs in the State of Illinois, won several youth football league championships, and attracted thousands of volunteers, coaches, athletes from the area. (Toulon Dec. ¶¶ 5-8). But what does the "Falcons" mark actually mean to the plaintiff's – and defendants' – consumers? There is no evidence of what the mark means or what people associate it with. There is no evidence that parents associate "Falcons" with anything in particular, as opposed to, perhaps, Park Ridge football. There are parents who want their kids to play a fun, participatory brand of football (plaintiff's current program) and parents who want their boys to play a highly competitive tackle on a traveling team (a program defendants offer but plaintiff no longer does).

**Actual Confusion**. While a plaintiff does not *have to* prove this element with evidence of actual confusion, it must provide some type of evidence. *Barbecue Marx, Inc. v. 551 Ogden, Inc.*, 235 F.3d 1041, 1045 (7th Cir. 2000). Similarity of the marks is not enough to demonstrate this factor. "[W]e are concerned here with evidence of actual confusion, not a mere risk of confusion,

and we find no such evidence in the record. The similarity of the two marks is a separate consideration in our analysis, and although it does create a risk of confusion, it does not constitute evidence of actual confusion." *Eli Lilly & Co. v. Nat. Answers, Inc*., 233 F.3d 456, 465 (7th Cir. 2000); *see also Libman Co. v. Vining Industries*, Inc., 69 F.3d 1360, 1363 (7th Cir.1995) ("But our point is only that a finding of likely confusion can no more be based on pure conjecture or a fetching narrative alone than any other finding on an issue on which the proponent bears the burden of proof.").

There is some evidence of actual confusion here, but given the context, it is not terribly dispositive. First, there are the emails from Mr. Colleran's wife, and the story from Mr. Thillens. It has to be said, that given the context, they aren't terribly convincing. One of Mrs. Colleran's emails is from the Maine Eagles, which is an organization she is a member of. ( Purcell Aff., ¶ 16). The other is from a friend. Obviously, such evidence would be stronger if it were to come from outside the Plaintiff Directors' clique. As for Mr. Thillens, there are obvious credibility issues there given Mr. Sroka's challenge to his story, as well as the possibility that defendants' counsel was engaging in a bit of trickeration by focusing on the date of the conversation.

Then we have the emails attached to plaintiff's Reply Brief. These are from the hard-core, travel tackle football parents, who are hoping to sign their sons up for the travel tackle program, a program plaintiff is not offering. The parents don't care if the program is called Falcons, Eagles, Lions, Tigers, or Bears. There is no evidence of confusion stemming from anyone using the name, "Falcons." None! Indeed, the confusion, if any, comes from plaintiff being less than clear when it did away with the travel team that parents were familiar with and folded it into a house league. Even now, plaintiff's website, which is not exactly crystal clear, explains things this way:

> Falcons Travel Tackle Football. For the same price as paid in the fall, Tackle Football players will actually get 2 seasons…Conditioning/ skill development and 7 on 7 intra-squad scrimmages in the fall and an actual tackle season (based on the IHSA statements this week-in the spring) The expectation is this will begin Tuesday, August 4th and end the last week in October.

https://cdn3.sportngin.com/attachments/document/5a80-2221543/Fall_Season_Announcement_0 8022020.pdf#_ga=2.267840078.1328407925.1596801742-2139499724.1596481108. Moreover, if a parent clicked on the tab for information on plaintiff's "Falcons Travel Football" program, they would read that plaintiff was going through with a travel tackle football team:

> 8 games played on Friday nights, Saturdays, or Sundays beginning the first weekend after Labor Day and ending the last week of October.

https://www.prfootball.com/page/show/4108298-falcons-travel-tackle-football. Obviously, that's not the case as plaintiff concedes. But one can certainly see the inspiration for the emails the plaintiff claims show confusion caused by the defendants.

It can arguably be read that an "actual tackle season" was to begin August 4th. And, according to plaintiff's submissions with gaps filled in by Mr. Purcell, plaintiff eliminated the Travel Tackle Football team as the football parents knew it. That is what comes through in the emails to Mr. Hoffman. Parents were looking for *that* team, and plaintiff's website, seemingly, led them to the restructured program.

In sum, if there was some confusion, it does not appear to have been driven by the name "Falcons," but rather by plaintiff's elimination of a long-standing program, and the disruption that has been visited upon just about every aspect of our lives by the coronavirus pandemic.

**Bad faith/Intent to Palm Off.** Again, and it cannot be stressed enough, there is a significant difference between a 13-team house league and a travel tackle football team playing rivals from across

the northern quarter of the state and into neighboring Indiana. Defendants clearly don't want to be associated with Covid-19 safe in-house program, now offering only flag football competition. Incredibly, given the threat posed by the virus, the defendants have gone so far as to move practices 60 miles away to Crown Point, Indiana – a state with lesser safety protocols. The parents who sign their sons up for this program are not the parents who want their sons to play fun, flag football. The name counts for nothing. It is the contents of the program that is everything. Indeed, as is clear from the emails, the "Falcons" name means little or nothing to them. What is of utmost importance are words like "travel" and "tackle." Defendants would not want to palm off a flag football program.

       **Irreparable Harm and Balancing**[2] Given the foregoing discussion, the plaintiff's likelihood

---

[2] Traditionally, the Seventh Circuit has said that there is a presumption of irreparable harm in Lanham Act cases. *Promatek Indus., Ltd. v. Equitrac Corp.*, 300 F.3d 808, 813 (7th Cir. 2002). *See, e.g., Redbox Automated Retail, LLC v. Xpress Retail LLC,* 310 F. Supp. 3d 949, 952 (N.D. Ill. 2018). However, in *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391–94 (2006), the Supreme Court called this presumption into question in the patent context and rejected the categorical rule that a permanent injunction must issue upon a showing of patent infringement. *Id.* at 394. The Seventh Circuit has not addressed whether *eBay* applies to Lanham Act cases, but it has held that "*eBay* governs a motion for a preliminary injunction in a copyright case." *Flava Works, Inc. v. Gunter*, 689 F.3d 754, 755 (7th Cir. 2012).

Additionally, district courts within the Seventh Circuit, including this district, have expressed doubt as to whether the Seventh Circuit would reach a different conclusion in cases falling under the Lanham Act. *Se*e Ill. *Tamale Co. v. El-Greg, Inc.*, 2019 WL 4395139, at *19 (N.D. Ill. Sept. 13, 2019) ("This Court sees no reason why the Seventh Circuit would reach a different conclusion in a Lanham Act case."); *Market Track, LLC v. Efficient Collaborative Retail Mktg., LLC*, 2015 WL 3637740, at *23 (N.D. Ill. 2015); *Nat'l Fin. Partners Corp. v. Paycom Software, Inc.*, 2015 WL 3633987, at *12 (N.D. Ill. 2015); *see also* Ferrlng Pharm., Inc. v. Watson Pharm., Inc., 765 F.3d 205, 216 (3rd Cir. 2014)("there is no presumption of irreparable harm afforded to parties seeking injunctive relief in Lanham Act cases." ); *Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.*, 736 F.3d 1239, 1249 (9th Cir. 2013)(requiring irreparable harm be demonstrated before a preliminary injunction may issue in a trademark infringement action); *North American Med. Corp. v. Axiom Worldwide, Inc.*, 522 F.3d 1211, 1228 (11th Cir. 2008) ("Although eBay dealt with the Patent Act and with permanent injunctive relief, a strong case can be made that eBay's holding necessarily extends to the grant of preliminary injunctions under the Lanham Act."); *Audi AG v. D'Amato*, 469 F.3d 534, 550 (6th Cir. 2006) (applying *eBay* to a permanent injunction in a trademark infringement case without extensive analysis). As such, and given the unchallenged notion that a preliminary injunction is extraordinary relief, we will not assume irreparable harm here and require a demonstration of same from the plaintiff.

of succeeding on the merits is not very good. As such, plaintiff must make a strong showing of irreparable harm. *Kraft Foods Grp*, 735 F.3d at 740. Plaintiff has not done so. Plaintiffs certainly did not act as though they will suffer irreparable harm. As already noted, they waited three months to move for an injunction. It is not as though they needed that time to comb the Northwest Suburbs for evidence. Their affidavits are strictly in-house, from members of their board. They are augmented by nothing more than a couple of emails to one of the board member's wives, a handful of emails to another board member, screenshots, and a newspaper article. This was not an extensive canvassing of the community for evidence.

When, a day after plaintiffs filed, Judge Guzman referred their motion for a report and recommendation, plaintiffs did not object or give Judge Guzman any indication that the additional time before the motion would be resolved – at the very least, over a month pursuant to the timeframe set out in least a month – was of any significance. That was June 24th. The last day of sign-up for football was August 1st. Given the inevitable briefing schedule, plus the addition of an extra month of delay resulting from a referral for a Report and Recommendation, Fed.R.Civ.P. 72(b)(2), and then subsequent *de novo* review, there would be, and is, no way plaintiffs could avoid their alleged "irreparable harm." [Dkt. #42-1, at 13-14].[3] Judge Guzman clearly thought little of plaintiff's claim,

---

[3]Internal Operating Procedure 14 allows for the referral of motions for preliminary injunctions to magistrate judges for reports and recommendations. As noted, Fed.R.Civ.P. 72(b)(2) sets out a 28-day briefing schedule for objections and responses to reports and recommendations, only then followed by *de novo* review of the motion and those briefs by the referring district court judge. Even if a TRO is in place – notably, plaintiff did not seek one here, which further detracts from its claim of irreparable harm – it would expire in 28 days, Fed.R.Civ.P. 65(b)(2); *H-D Michigan, LLC v. Hellenic Duty Free Shops S.A.*, 694 F.3d 827, 843–44 (7th Cir. 2012), before the district court judge could rule on the report and recommendation and, if finding for the movant, prevent the claimed irreparable harm. As such, a decision to refer such a motion under Rule 72(b) is tantamount to a finding that there will be no irreparable harm or, at least, an indication that the district court judge does not think much of the movant's case for irreparable harm.

and I have to agree.

Certainly, delay does not support an attorney's claim that there is some sort of impending irreparable harm or an emergency of any sort. That's just common sense, as court after court has found. *See, e.g., Shaffer v. Globe Prot., Inc.*, 721 F.2d 1121, 1123 (7th Cir. 1983)(two month delay before requesting injunctive relief was "inconsistent with a claim of irreparable injury."); *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016); *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2nd Cir. 1985)("Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action"); *Arjo, Inc. v. Handicare USA, Inc.*, 2018 WL 5298527, at *9 (N.D. Ill. 2018); *Traffic Tech Inc. v. Kreiter*, 2015 WL 9259544, at *17 (N.D. Ill. 2015); *Stokley-Van Camp, Inc. v. Coca-Cola Co.*, 1987 WL 6300, at *3 (N.D. Ill. 1987) ("[T]he fact that [the plaintiff] waited three months indicates a lack of a need for the extraordinary remedy of a preliminary injunction."). The three-month wait, combined with the additional, automatic delay occasioned by Judge Guzman's referral – a delay plaintiffs made no objection to – undermines plaintiffs' claim of impending irreparable harm.

And we use the phrase "impending irreparable harm"advisedly. The extraordinary remedy of a preliminary injunction is designed to protect against future harm, not, harm that has already passed. *Turnell v. CentiMark Corp.*, 796 F.3d 656, 662 (7th Cir. 2015)(movant must show that "absent preliminary injunctive relief, he will suffer irreparable harm *in the interim prior to* a final resolution . . . ." (emphasis added)); *Traffic Tech*, 2015 WL 9259544, at *17("Even assuming that those emails contained trade secrets, and even assuming that the harm stemming from the dissemination of those trade secrets was irreparable, there is no plausible allegation as to how any information in those emails—sent approximately 17 months ago—continues to inflict irreparable harm

upon Plaintiff. In a phrase, the damage is done."); *Square D Co. v. Van Handel*, 2005 WL 2076720, at *8 (E.D. Wis. 2005)(". . . the amount of water now under the bridge counsels against a finding of irreparable harm. If [defendant] violated the Trade Secrets Act, the damage has already been done."); *iFreedom Direct Corp. v. McCormick*, 2016 WL 9049647, at *4 (C.D. Cal. 2016)("Plaintiff 'has not shown why issuing a preliminary injunction now would prevent any irreparable harm beyond the damage already done.'. . . These considerations weigh against a finding of irreparable harm."); *Innospan Corp. v. Intuit, Inc.*, 2010 WL 5157157, at *2 (N.D. Cal. 2010)(plaintiff "waited to request preliminary relief until after it already had suffered the bulk of its alleged harm, and . . . has not shown why issuing a preliminary injunction now would prevent any irreparable harm beyond the damage already done."); *Alvarez v. City of New York*, 2 F. Supp. 2d 509, 514 n.5, 514-15 (S.D.N.Y. 1998) (rejecting irreparable harm to reputation where the fact of investigation was already publicized, so "any 'damage' [wa]s already done"). The Park Ridge parents who weighed the risks of football for their sons have already signed their boys up for plaintiff's house league or defendant's traveling team. The damage – or confusion – if there was any, is done.

As the plaintiff does not appear to have much likelihood of success *and* there is no or little threat of irreparable harm, no balancing of harms needs to be done. *Proft v. Raoul*, 944 F.3d 686, 693 (7th Cir. 2019); *Eli Lilly & Co. v. Arla Foods, Inc.*, 893 F.3d 375, 381 (7th Cir. 2018). But it has to be said that there appears to be little harm on either side. For example, plaintiff says it will lose donations to its programs if defendants are not enjoined from using the name "Falcons." Plaintiff provides no evidence of this – most likely because if there is a loss of donations, it is because plaintiff eliminated a program 60-80 parents want their sons to participate in. Plaintiff claims that defendant practicing outside Illinois to avoid Covid-19 safeguards somehow damages *its* reputation. But that

conclusion is based on nothing but conjecture and the supposition that the parents of aspiring football players would, in fact, be offended by taking steps that would allow their sons to play football – which, after all, is the very thing desired by the parents of enrollees. But, again, it's rather clear from even plaintiff's submissions that the consuming public is one type of parent or another. On the other side, defendants claim to have spent approximately $10,000 to $15,000 in the marketing, advertising, and promotion of the league under the Park Ridge Travel Falcons mark. They don't say on what or how. But it would not seem terribly harmful to operate under a different name or, more obviously, operate under a different name from the beginning. Using the same name was, to be frank, the height of laziness. We can't say the balance of harm goes either way, which sheds light on the real importance of the issues we are actually dealing with here. In other words, this whole thing is a bit of a scrimmage in a teacup.

## FINAL SCORE

For the foregoing reasons, it is recommended that the plaintiff's Motion for a Preliminary Injunction [Dkt. #42] be denied.

RESPECTFULLY SUBMITTED,

_____
UNITED STATES MAGISTRATE JUDGE

**DATE:** 8/20/20

The parties have 14 days in which to object – and 14 further days in which to respond to any objections – and trigger a *de novo* review of the foregoing issues and findings; the parties are entitled to a clear error review in any event. Fed. R. Civ. P. 72(b)(3); *White v. Sloop*, 772 F. App'x 334, 337 (7th Cir. 2019); *see also Mendez v. Republic Bank*, 725 F.3d 651, 661 (7th Cir. 2013)("*De novo* review requires the district judge to decide the case based on an independent review of the evidence and arguments without giving any presumptive weight to the magistrate judge's conclusion."). Failure to object within the fourteen days results in a waiver. *United States v. Gibson*, 958 F.3d 661, 663 (7th Cir. 2020); *Gabb v. Wexford Health Sources, Inc.*, 945 F.3d 1027, 1033 (7th Cir. 2019).