**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **PARK RIDGE SPORTS, INC.,** | ) | |
| **an Illinois Not For Profit Corporation,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 20 C 2244** |
| | ) | |
| **v.** | ) | **Magistrate Judge Jeffrey Cole** |
| | ) | |
| **PARK RIDGE TRAVEL FALCONS,** | ) | |
| **an Illinois Not For Profit Corporation,** | ) | |
| *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |

## REPORT AND RECOMMENDATION

### INTRODUCTION

The plaintiff filed this suit on March 30, 2020, complaining that the defendants' boys football teams were using the nickname "Falcons" and associated logo; a nickname that plaintiff's boys' football teams had been using previously. On June 23, 2020, plaintiff filed a motion to preliminarily enjoin the defendants' boys' teams from using the nickname. Plaintiff assured the court that it "was not a close case" and the defendants' use of the "Falcons" nickname was "an *existential* threat to Plaintiff's non-profit program." [Dkt. #42-1, at 2 (emphasis added)]. In other words, plaintiff's boys' football program could not exist if the court did not grant plaintiff's motion. So, despite the fact that this case was about nothing more than what NFL logo and nickname a group of football fathers team plagiarized for their kids to play under – neither the plaintiff nor the defendants originated the nickname and logo for a football team, after all [Dkt. #97-4, Pl. Ex. 45]– it was life and death stuff, at least in terms of two youth football organizations in the Chicago suburb of Park Ridge.

After two rounds of briefing that took a magistrate judge and a district court through 250 and 29 pages of filings, respectively [Dkt. ##42, 52, 53, 61, 66] and necessitated two opinions [Dkt. ##58, 68], the plaintiff lost. Twice. As for an "existential threat," there was none. Plaintiff's football program continues on. In fact, plaintiff did not even bother to appeal Judge Guzman's *de novo* ruling. 28 USC 1292(a)(1). So, to paraphrase what the plaintiff said the first time around, it was not a close case. [Dkt. #42-1, at 1].

A year has gone by and the plaintiff is back, incredibly, for a third bite of the apple, having filed another motion for a preliminary injunction on September 23, 2021. [Dkt. #96]. Judge Guzman quickly referred this third try for a Report and Recommendation as well. [Dkt. #99]. Because there has been some confusion among the lawyers as to the import and effect of a Report and Recommendation, *see, e.g.,* [Dkt. #82, at 3], it should be noted that a report and recommendation is, essentially, a nullity until the referring district court judge acts on it. If it were to recommend that a preliminary injunction be granted, nothing would happen; there would be no injunction. That is because once the parties object, the referring judge must "engage in the same exercise as the [magistrate judge]" did, *Bruening v. Constr. Workers Health Fund*, 165 F.3d 31 (7th Cir. 1998), according no weight or deference to the magistrate judge's findings. *See United States v. Raddatz*, 447 U.S. 667, 690 (1980)(Stewart, J, dissenting). The Seventh Circuit has, in another context, indicated that *de novo* review means the previous review is "irrelevant." *Groves v. Apfel*, 148 F.3d 809, 811 (7th Cir. 1998). And, even where the parties don't object, the report and recommendation has no effect; the referring judge must still act on the report and recommendation and review it for clear error. *Kruger v. Apfel*, 214 F.3d 784, 787 (7th Cir. 2000); *Johnson v. Zema Sys. Corp.*, 170 F.3d 734, 739 (7th Cir. 1999).

So, what's the point of going through this exercise for a third and then, necessarily, a fourth time while other litigants wait in the queue for their first tries? *See, e.g., Fort Howard Paper Co. v. Standard Havens, Inc.*, 901 F.2d 1373, 1380 (7th Cir. 1990)("The interests of justice go beyond the interests of the parties to the particular suit; ... delay in resolving a suit may harm other litigants by making them wait longer in the court queue."); *Chapman v. First Index, Inc.*, 796 F.3d 783, 787 (7th Cir. 2015)("[W]hy should a court supply a subsidized dispute-resolution service [for uneccesary disputes] ... when other litigants, who do need the court's aid, are waiting in a queue?"). Plaintiff, continuing to be a bit dramatic and hyperbolic, says there has been "a *seismic* change in the law and new evidence" uncovered in the year of discovery since plaintiff's first and second tries that "*drastically* alter the Court's preliminary injunction analysis and *heavily* favor granting the requested relief":

> The Trademark Modernization Act of 2020 became law. Per it, trademark movants are now entitled to a rebuttable presumption of irreparable harm upon showing a likelihood-of-success on the merits.

> The state of Illinois lifted the COVID-19 restrictions on tackle football, which means Park Ridge Sports and Defendants can now offer tackle football in Park Ridge. In the fall of 2020, Park Ridge Sports did not offer tackle football as it adhered to the restrictions. Defendants, skirting them, based their tackle football team in Indiana.

> Discovery has revealed Defendants' intent to palm off the Park Ridge Falcons' mark as their own. For example, Defendant Walbert admitted during his deposition that Defendants named their football team what they did "because they are the historic Travel Falcon program."

> Park Ridge parents are now confused as to the state of the Park Ridge Falcons mark. For instance, one parent wanted to sign their child up for the "original" Park Ridge Falcons but had wrongly signed their child up for the "new offshoot."

[Dkt. # 97, at 6-7]. The court will assess and touch on how drastic any of that is to the extent necessary as it goes through, again, the consideration and weighing of all the factors that go into a

determination of whether to grant the "extraordinary and drastic" relief – that's the Supreme Court's description – of a preliminary injunction. *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008).

## I.

As two judicial officers have already trod over this frozen tundra twice, *de novo*, this report and recommendation will be more of a highlight reel compared to last fall's game film. This time around plaintiff kicks off with hundreds of pages of old programs, photos, and newspaper clippings, mostly from the 1969-1972 era and the early 1980s. All but a few of those pages provide nothing to add to the consideration of the issues in this case. The photos are nostalgic and depict children having fun, but plaintiff has brought this to federal court, and has done it for a second time. What do page after page of grainy photos of children playing football on unnamed teams contribute to the court's analysis? Or Punt, Pass, and Kick competitors? Of young cheerleaders cheering for teams designated by a "J", or a "V", or a "B". Of a couple of boys posing in the family den? It is, in the main, little more than a document dump.

Plaintiff does not even take the trouble to direct the court to which pages of the mass of old photos and program include anything regarding the Falcons. It is, indeed frustrating, especially the second time around, to have to page – or more accurately, scroll, through page after page in order to find anything of relevance to this case. A bit more assistance from counsel might have been helpful. *See Dal Pozzo v. Basic Mach. Co.*, 463 F.3d 609, 613 (7th Cir. 2006)("An advocate's job is to make it easy for the court to rule in his client's favor . . . .").[1] After all, "judges are not like pigs hunting for truffles buried in briefs." *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991).

---

[1] In future filings, it would be advisable for plaintiff to file their exhibits as they recently did in their motion to compel [Dkt. #114] and file exhibits separately instead of doing so in 20 or 40 exhibit clumps of 100, 200, or 300 pages. It would enable the court to more easily – much more easily – access the exhibits plaintff refers to in its briefs.

Nevertheless, the court did sift through the plaintiff's haystack, although the search was, in the main, fruitless. The team appears to have begun as the Park Ridge Mighty Mites in the late 1960s. PRSI0001, 0274. The organization apparently included a number of teams at various levels: "Junior Traveling Team", "Midget Vikings", "Widget Traveling Team", "Midget Chargers", "Pee Wee Traveling Team Park Ridge Falcons", "Midget Browns", etc., all using NFL nicknames. PRSI0004-52. Those are the squads all those initialed cheerleader uniforms match up with. In 1969, for example, the traveling team was listed as "Juniors–Park Ridge Traveling Team." PRSI0237; PRSI0244. Another 1970 program lists the Falcons as one among many midget and widget squads. The widget and junior traveling teams had no nickname. PRSI0246-0249, PRSI0255. The same was true in 1971 and 1972 and thereafter. PRSI0265-67; PRSI0278-79. One hundred pages of blurry old photographs from 1978 mention only the Mighty Mites. PRSI11597-11694. At the same time, local paper articles from the era did occasionally refer to the Park Ridge team as the Falcons, but that's a rarity in the plaintiff's offering. PRSI0268; PRSI0285. Through around one hundred pages of 1980s era memorabilia, there is precious little mention of the nickname "Falcons." Indeed, at times, it appears that the "Falcons" were a house team and the traveling teams had no nickname. [Dkt. #97-2, PRSI11618; PRSI11628 (Traveling widgets vs widget falcons)]. Elsewhere, there's a photo of a Powder Puff girls' game with the nickname "Falcons" visible on what appears to be a coach's jacket from around 1981. PRSI11846. The traveling Widgets' and Juniors' have the Atlanta Falcons logo in the corner of their photos, but the nickname Falcons is not in print. PRSI11850, PRSI11852. If one squints, one might discern that Atlanta Falcons logo on a young boy's helmet in a few of the hundreds of photos. PRSI11833, PRSI11844. Mostly, however, the Park Ridge boys appear to have played in white, logoless helmets.

Plaintiff seems to think that these hundreds of pages of photos and program listing show that Park Ridge Sports established "Falcons" as its trademark 50 years ago. [Dkt. #97, at 8-14]. But, all plaintiff has done was provide the court with a haystack, point out a handful of needles in that haystack and say, "it's mostly needles." Based on plaintiff's submissions, through all those early years, there is precious little mention of "Falcons"; the dominant brands are Mighty Mites and, of course, Park Ridge. It is not until the 2000s that the Falcons nickname seems to have taken hold. To the extent it has taken hold, it is used in these programs and photos to identify the traveling team, as opposed to all of the plaintiff's other teams. As Judge Guzman ruled over a year ago now, the nickname "'Falcons' does not identify plaintiff's football program or programs, it identifies the community's traveling tackle football program . . . ." *Park Ridge Sports, Inc. v. Park Ridge Travel Falcons*, 2020 WL 6262394, at *2 (N.D. Ill. 2020). And, as plaintiff says in the replay of its 2020 motion, the two types of football, although both run by the plaintiff, were decidedly different things. [Dkt. #97, at 14 (". . . prior to January 2015, Park Ridge Sports two tackle football programs—the Park Ridge Falcons program and the "house" program (more about this program below)—each had their own management boards, but these boards shared "one oversight board under Park Ridge Sports.")].

As can best be distilled from the parties' submissions, the trouble among the football dads now arguing over this children's team nickname here in federal court began around 2018. Prior to 2018, there were two distinct boys' programs on offer. There was "house" football; a collection of teams, playing tackle football against one another in Park Ridge. They never played teams from other suburbs. [Dkt. # 97, at 14; PRSI 12266, 13125, 15084]. Those teams are the ones depicted in those old photos of "Vikings" and "Jets" and "Browns" and so forth. The plaintiff refers to them

as the "non-Park Ridge Falcons teams." [Dkt. #97, at 14-15]. Then there was the travel tackle team, the more competitive team, that payed teams from other communities. These were the "Falcons." As the defendants put it, "[h]istorically, the city of Park Ridge, Illinois offered two youth football programs: (1) a travel youth football program known as the "Falcons"; and (2) a house football program, which consisted of numerous teams using NFL team names that played against one another." [Dkt.#107, at 5].

Those traditions faded and things became mercurial in 2018. The number of young players the programs attracted diminished, and the plaintiff merged the Falcons travel football program merged with what remained of the house football program. What had been the house football program became something of a hybrid. The teams left in that program – using various NFL names – played each as they had done before, but also played a few games against nearby teams in the Central Suburban Youth Football League ("CSYFL"). [Dkt. #97, at 15; Pl. Ex 36, 37]. The traditional travel football Falcons continued on playing teams from other towns – and even states -- in a more widespread area in the United Youth Football League.

In 2019, the changes continued. Plaintiff decided to "call House level tackle by the Falcons name" so there would be two Falcons teams: Park Ridge Falcons in the "UYFL Travel league" and the Park Ridge Falcons in the "CSYFL League." These were still two different levels of play and so, the plaintiff called the more competitive "UYFL Travel league" Falcons "D1" and the "House level" CSYFL team "D2", in order to attract "the right players in each division based on what was important to them vs recruiting to get a team." [Dkt. #97-4; Pl.Ex. 38].

After one season, that wasn't working either. The numbers were still declining; in a community of 37,480, only 200 or so boys were still involved in plaintiff's football programs.

Plaintiff determined that it could no longer support two programs.  One can see from the minutes of the March 18, 2020 meeting that there had been a lot of disagreement over this issue brewing well before the meeting.  Some of the dads did their own research, polling parents and other communities' teams regarding the problems.  [Dkt. #97-4, Pl.Ex. 41].  Indeed, the four defendants began discussing a plan to keep an elite level team in Park Ridge before that meeting. [Dkt. #97-4, Pl.Ex. 42].  And so, this meeting is where the schism among the football fathers came to a head.  In the end, plaintiff's board voted 8-4 to abandon its more competitive "UYFL Travel league" Falcons "D1" team and collapse that into its "House level" CSYFL "D2" team.  PRSI10692. .  [Dkt. #97-4, Pl.Ex. 41]. So, there would be no more D1 UYFL team in Park Ridge [Dkt. #97-4, Pl.Ex. 41]; and that team had just won the 2019 UYFL championship. [Dkt. #XX; Def. Ex. 3].  The defendants in this case include three of the four who voted against the move to end the D1 UYFL travel team and go with the D2 CSYFL team. [Dkt. #97-4, Pl.Ex. 41].

It's not clear what plaintiff sees here, or how plaintiff sees what it wants the court to see. Contrary to plaintiff's impression, evidence of the plaintiff's use of the Falcons nickname over the last fifty years is sketchy at best.  Be that as it may, more recently, the evidence does show that plaintiff called its highest level teams – its traveling teams – the Falcons, and all its less competitive teams several other nicknames, all of which, including Falcons, plaintiff simply copied from the NFL.[2]  Then, in 2019, there were two "Falcons" teams as plaintiff decided to use "Falcons" for its top-level travel team *and* its "House level tackle" teams, which started playing a handful of games against teams from other communities, and designated the traditional, high level travel team D1, and

---

[2] Plaintiff amusingly suggests that the fact that the defendants were able to have "a logo, and jersey designs" shows that they had long been planning a mutiny.[Dkt. #97, at 17]. That's nonsense, of course.  The parties on both sides of this case simply and mindlessly copied names and logos from NFL teams, including the Atlanta Falcons.

the second-tier squad D2. But in 2020, plaintiff eliminated the D1 team – the traditional travel team that plaintiff had for fifty years and waxes nostalgic about in its brief. All that was left was the second-tier D2 team.

As the plaintiff asserts, it "ha[d] built the Park Ridge Falcons mark into one that identifies a travel tackle football team with a long lineage of notable participants, including some of the Defendants." [Dkt. #97, at 13]. Simply put, that's *not* the D2, "House level tackle" team that plays in the CSYFL, though. It was the high-level travel team – the D1 team – that had long been established as the "Falcons." That's the team with the long lineage plaintiff talks about in its brief, not the hybrid team or the level tackle team. The plaintiff abandoned the D1, highest level of youth football, and went with the less competitive D2 level. The dissenting dads wanted to keep the higher level, D1 travel team going and, so, they endeavored to do so. As Defendant Kilburg wrote in a February 10, 2020 email among the board members on both sides of this case: "Park Ridge indeed needs a D1 offering or somebody will come in and create one, just like all of the youth basketball players in PR and now playing I[llinois] C[entral] E[lite]." [Dkt. #97-4, Pl. Ex. 43]:

There is a significant difference between offering a youth sports program that competes at the highest level available, and any other tiers that might be offered. Some parents want their sons engaged in that high level of competition[3], traveling to not just neighboring communities, but farther afield and in different states. That was the tradition of the Park Ridge Falcons that plaintiffs boast of, not the D2 team plaintiff offers now. Defendant Walbert in his deposition:

---

[3] It perhaps says something about the combatants – and that is a fair description of the parties – on both side of this litigation that there is no indication – not a mention and certainly no evidence – of what the boys who actually play and for whom the programs exist – might want. When one reads the submissions from the football fathers and their eight attorneys and three law firms, the impression is that what the boys might like does not enter into their thinking.

Q.  Why did you call your team the Falcons?

A.  We didn't.  We called the team the Park Ridge Travel Falcons because they are the historic Travel Falcon program and that's what the name is.

[Dkt. #97-4; Pl.Ex. 48)].  In another email to parents, Defendant Walbert said: "I am proud to be a part of the new Park Ridge Travel Falcons organization, which will seamlessly continue to offer D1.

Tim Walbert made the defendants' continuation of the D1 traveling team and the plaintiff's falling back on, and offering only, the D2 team clear in his May 31, 2020 email to 7th grade parents:

If your son wants to play D1 competitive travel Falcons football, the PR Travel Falcons is the best choice.  If your son wants to play a blended D2/D1 program with traditional house league rules (rotate every two plays, etc), then the PRFB travel house league is the right program.  Neither program is better than the other, it is up to our sons and us to choose the program they would like to participate in.  There will be experienced non parent and experienced parent coaches in both leagues.

UYFL teams are designated as Regional All Star Teams and that league, as you know, had many other issues.  Pop Warner is a community based competitive travel league, like Park Ridge, currently with 42 community members. We aspire to continue to work alongside with PRFB with the ultimate goal of finding a  home for every child that wants to play football (flag, travel house and travel) and feel there should continue to be options for everyone just like all the other sports in this community.

Just to be clear – there are NO feeder football teams. Everyone can choose to play at the high school level regardless of what experience or lack thereof upon entering high school.

I am proud to be a part of the new Park Ridge Travel Falcons organization, which will seamlessly continue to offer D1 Falcons football to our Park Ridge community.

[Dkt. #97-4, Ex. 47].

So, essentially, for a long time, there were two levels of youth football in Park Ridge.  More recently, the plaintiff collapsed the high level, D1 travel team into the lower "House level", D2 team, eliminating the D1 team.  Defendants broke away from the plaintiff to keep the D1 team going.

There were two significantly different branches of youth football; plaintiff lopped one branch off and defendants picked it up and kept going.

## II.

## A.

### Preliminary Injunction Standards

To obtain a preliminary injunction, a plaintiff must establish that: (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief; and (3) legal remedies are inadequate. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *Cook Cty., Illinois v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020).[4]  As noted over a year ago in the first Report and Recommendation, "preliminary injunction analysis is inexact and hardly a science. Motions for preliminary injunctions call upon courts to make judgments despite uncertainties." *Planned Parenthood of Indiana & Kentucky, Inc. v. Adams*, 937 F.3d 973, 980 (7th Cir. 2019).  To underscore that sentiment, the "likely to succeed on the merits" element has been  in a state of flux. For years, the Seventh Circuit said that all a movant had to do was show that they had "some" likelihood of succeeding on the merits and that meant a "better than negligible chance."  *See, e.g., Hoban v. Wexford Health Sources, Inc.*, 731 F. App'x 530, 532 (7th Cir. 2018)("A 'likelihood of success' requires only a 'better than negligible' chance of succeeding on the merits. . . . The standard employed by the district court—a "clear" indication that the plaintiff would prevail—was therefore improper."); *HH-Indianapolis, LLC v. Consol. City of Indianapolis & Cty. of Marion, Indiana*, 889 F.3d 432, 437 (7th Cir. 2018)("The likelihood of success requirement is a low threshold; HH must

---

[4] There is no dispute that traditional legal remedies would be inadequate to rectify the type of harms plaintiff alleges.

only show that its claim's chance of success is 'better than negligible.'"); *D.U. v. Rhoades*, 825 F.3d 331, 338 (7th Cir. 2016)("In framing the probability of success necessary for a grant of injunctive relief, we have said repeatedly that the plaintiff's chances of prevailing need only be better than negligible."); *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1096 (7th Cir. 2008)("To succeed in its attempt to preliminarily enjoin GSUSA from interfering with its jurisdiction, Manitou must show that it has a "better than negligible" chance of success on the merits of at least one of its claims."); *Michigan v. United States Army Corps of Engineers*, 667 F.3d 765, 782 (7th Cir. 2011)("But the threshold for demonstrating a likelihood of success on the merits is low.").

It turns out that's not the case. Two weeks after my Report and Recommendation was issued, the Seventh Circuit used two preliminary injunction appeals to more clearly align itself with Supreme Court precedent and send that message to the district courts, explaining that it "ha[d] at times—confusingly—cited the 'better than negligible' phrase as if it were the proper standard for evaluating the likelihood of success on the merits at the preliminary injunction stage." *Mays v. Dart,* 974 F.3d 810, 821–22 (7th Cir. 2020). But, the standard is actually higher and more difficult to meet. The movant's burden is "significant," and they must make a "strong showing":

> We note this to remind both the district courts and ourselves that the "better than negligible" standard was retired by the Supreme Court.
>
> We understand from both *Winter* and *Nken*[5] that an applicant for preliminary relief bears a significant burden, even though the Court recognizes that, at such a preliminary stage, the applicant need not show that it definitely will win the case. A "strong" showing thus does not mean proof by a preponderance—once again, that would spill too far into the ultimate merits for something designed to protect both the

---

[5] "It is not enough that the chance of success on the merits be 'better than negligible.'" *Nken v. Holder*, 556 U.S. 418, 434 (2009)

12

parties and the process while the case is pending. But it normally includes a demonstration of how the applicant proposes to prove the key elements of its case. And it is worth recalling that the likelihood of success factor plays only one part in the analysis. The applicant must also demonstrate that "irreparable injury is likely in the absence of an injunction," *see Winter* [*v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 [(2008)]. In addition, the balance of equities must "tip[ ] in [the applicant's] favor," and the "injunction [must be] in the public interest." *Id.* at 20.

*Illinois Republican Party v. Pritzker*, 973 F.3d 760, 763 (7th Cir. 2020).

Notably, plaintiff couches his motion for an injunction under the lesser, retired standard. [Dkt. #97, at 24 ("For present purposes, however, Park Ridge Sports need only show that it has a better than negligible chance of succeeding on those two elements. *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 897 (7th Cir. 2001).")].

What is more significant for our purposes is that Judge Guzman adopted my recommendation that plaintiff did not merit a preliminary injunction under the *more lenient* standard. [Dkt. ##67, 68].[6]

---

[6] It is, of course, rare for a party to be afforded two chances to obtain a preliminary injunction. In a previous Order, I indicated that "[u]nder the law-of-the-case presumption, a court should not reexamine its own rulings unless there is a compelling reason to do so." *Jones v. Bayler*, 756 F. App'x 635, 638 (7th Cir. 2019). In *Jones*, the Seventh Circuit noted that a "Magistrate Judge[]'s . . . order denying a preliminary injunction. . . . which [plaintiff] did not appeal, [was] . . .the law of the case in the district court" and should not be reexamined "unless there is a compelling reason to do so." 756 F. App'x at 638. Here, the plaintiff submits that the compelling reasons are the Trademark Modernization Act, *see Minch v. City of Chicago*, 486 F.3d 294, 301 (7th Cir. 2007) (change in law warrants reexamination), and "substantial new evidence introduced after the first review." *Kathrein v. City of Evanston, Ill.*, 752 F.3d 680, 685 (7th Cir. 2014). [Dkt. #110]. The court has taken that change in law – and an additional change in the law regarding the showing necessary to demonstrate some likelihood of success – into account in its review of the evidence plaintiff has presented in its second try.

But, although the court reviewed that evidence, it must be pointed out that the bulk of it cannot be considered "new." Generally, "new evidence means that a party "could not, through the exercise of due diligence, have . . . presented to the district court" the first time around. *Heft v. Moore*, 351 F.3d 278, 282 n.1 (7th Cir. 2003); *see also Aquinnah/Gay Head Cmty. Ass'n, Inc. v. Wampanoag Tribe of Gay Head (Aquinnah)*, 989 F.3d 72, 86 (1st Cir. 2021)(defining "new evidence [as] not earlier obtainable in the exercise of due diligence . . . ."); *Bishop v. Smith*, 760 F.3d 1070, 1087 (10th Cir. 2014)(". . . previously-available evidence often cannot be used to unsettle the law of the case."); Obviously, much of the evidence plaintiff has presented here was available to it a year ago.

Indeed, Judge Guzman found that "plaintiff's likelihood of succeeding on the merits is 'not very good.'" Plaintiff has added little of significance to its showing since then, so it has not met the "significant burden" of making a "'strong' showing" of some likelihood of success on the merits now required. *Pritzker*, 973 F.3d at 763.

## B.

### Preliminary Injunction Analysis

As the plaintiff submits, it must first show when it adopted that mark, and then it must show that it used the mark "in a way sufficiently public to identify or distinguish the marked goods in an appropriate segment of the public mind as those of the adopter of the mark." *Johnny Blastoff, Inc. v. L.A. Rams Football Co.*, 188 F.3d 427, 433 (7th Cir. 1999). Plaintiff has not registered the mark. Indeed, the plaintiff's evidence shows that the mark and logo have long be the property of the NFL's Atlanta Falcons. [Dkt. #97-4, Pl. Ex. 45]. Again, the plaintiff simply copied both the mark and the logo, as have perhaps countless other youth football organizations, and many of those right here in this area. *See, e.g.,* www.hinsdalefalcons.com; www.alsipfalcons.com; www.lombardfalcons.net; www.opyf.com (Oriole Park Falcons youth football); www.frankfortfalcons.org; www.chicagoparkdistrict.com (Junior Bear Football, Taylor Park Falcons). The mark and logo are anything but exclusive to the plaintiff.

In any event, plaintiff argues that:

From 1970 through now, the constant staple in Park Ridge Sports' sports offerings has been its travel tackle football teams, all of which it has called the "Park Ridge Falcons." In addition to the direct evidence detailed in Section II.A, Defendant Kilburg acknowledged in his February 10, 2020 email, discussed above, that the Park Ridge Falcons program has been around for 50-plus years.83 Worse still, Defendant Walbert made that acknowledgment twice in his May 31, 2020 solicitation email: (1) "the Falcons D1 travel program . . . has been offered in this community for over 50 years" and (2) "[t]he resigned board members . . . felt strongly that the community

of Park Ridge should continue to have a D1 travel football offering like it has for the
past 50+ years.

[Dkt. #97, at 24].

As can be seen from the discussion regarding the hundreds of pages of programs and photos
that plaintiff has submitted with its second motion for a preliminary injunction, evidence of plaintiff
using of the nickname "Falcons" for fifty years is minimal, as opposed to strong or significant.
*Pritzker*, 973 F.3d at 763. Use of the nickname for the plaintiff's highest level tackle football team
– the traveling team – is more clearly established in more recent times. But, even so, the evidence
also shows that plaintiff employed the nickname for two kinds of youth football offerings in 2019,
the traditional highly competitive traveling team and what plaintiff called a "House level" team.
Then, in 2020, plaintiff ceased offering the higher level traveling team program and employed the
nickname for a lower level team, which plaintiff itself called its "House level" CSYFL "D2" team.
As the plaintiff concedes in its assertion above, it no longer offers a D1 travel football team.
Plaintiff's evidence also shows that there is a big difference between a D1 and a D2 team. So,
plaintiff is using the mark for a significantly different program offering than it previously had.

It's worth pointing out that, in the prior proceeding, Judge Guzman found, *de novo*, that
"'Falcons' does not identify plaintiff's program, it identifies the community's traveling tackle
football program; a program plaintiff no longer offers and one that was merged with
plaintiff's programs for only a brief period . . . ." [Dkt. #68, at 5]. While the timeline of the
changes in plaintiff's football program offerings has crystalized, that does not change the result.
Again, even plaintiff asserts that "Falcons" means highly the competitive, traveling tackle football
team. It abandoned that level of boys' football for a lower D2 level before this lawsuit. The
defendants continued that level. This is not to commend what defendants did, as clearly, neither side

15

has covered itself in glory in this very distasteful and petty dispute. It is to say that plaintiff can't on the one hand show old photos of the Falcons Traveling Team to establish what the mark has long signified, and on the other hand, eliminate that team and say the mark signifies a lower level D2 team. The evidence surrounding plaintiff's adoption and use of the mark and logo for a high level, travel tackle football time is not nearly as strong as plaintiff suggests.

But, on to the likelihood of confusion factors. As was the case a year ago, seven factors comprise the likelihood of confusion test: "(1) similarity between the marks in appearance and suggestion; (2) similarity of the products; (3) area and manner of concurrent use; (4) degree of care likely to be exercised by consumers; (5) strength of complainant's mark; (6) actual confusion; and, (7) intent of defendant to 'palm off his product as that of another.' " *Barbecue Marx, Inc. v. 551 Ogden, Inc*., 235 F.3d 1041, 1043–44 (7th Cir. 2000). The likelihood of confusion test is an equitable balancing test. As a consequence, the "weight and totality of the most important factors in each case will ultimately be determinative of the likelihood of confusion, not whether the majority of the factors tilt the scale in favor of one side or the other." *Promatek Indus., Ltd. v. Equitrac Corp*., 300 F.3d 808, 812 (7th Cir. 2002); *Ty, Inc. v. Jones Grp., Inc*., 237 F.3d 891, 898 (7th Cir. 2001). While no single factor is dispositive, and courts may assign varying weights to each of the factors in different cases, three of the factors are particularly important: the similarity of the marks, the defendant's intent, and actual confusion. *Barbecue Marx*, 235 F.3d at 1044. In the end, however, unless a judge is the parent of a boy interested in playing highly competitive, traveling team, tackle football, "a judge's finding that confusion [is] likely [is] nothing but a surmise, a conjecture, a guess." *Kraft Foods Grp. Brands LLC v. Cracker Barrel Old Country Store, Inc*., 735 F.3d 735, 741-420 (7th Cir. 2013).

## Similarity Between the Marks in Appearance and Suggestion

As before, the marks are similar because both sides simply copied the nickname and logo from the established NFL Atlanta Falcons. The use of NFL nicknames in this manner is incredibly widespread. So, contrary to the tenor of plaintiff's three attempts at a preliminary injunction, "Falcons" is not somehow inextricably linked to the plaintiff or even to Park Ridge. A cursory internet search shows that use of the nickname "Falcons" for youth football is commonplace locally in just the first page or two of results. *See, e.g.,* www.hinsdalefalcons.com; www.alsipfalcons.com; www.lombardfalcons.net; www.opyf.com (Oriole Park Falcons youth football); www.frankfortfalcons.org; www.chicagoparkdistrict.com (Junior Bear Football, Taylor Park Falcons). As such, and as before, only "Park Ridge" distinguishes the youth football programs at issue here from the many other programs that have, like the parties here, simply copied nicknames and logos from NFL teams. And, as between the two teams at issue here, the distinguishing feature, now as before, is the word "Travel" or "Traveling." As Judge Guzman previously found, "the salient portion of the mark is the word 'travel.'" [Dkt. #68, at 8]. So it is not, as plaintiff claims, "the same name identifying the same service."

However, to the extent the defendants use "Falcons" without the adjectives Travel or Traveling, similarity would tip in plaintiff's favor. Defendants have filed a federal trademark application for not only "Park Ridge Travel Falcons", but for "Park Ridge Falcons" and "PR Falcons." That filing, given the primacy of several other registrants or applicants, appears to have gone nowhere. [Dkt. #97-4, Pl.Ex 43]. It does not appear, however, that the defendants have used "Falcons" without the "travel" adjective in connection with promotion of their program other than on one occasion. [Dkt. #97, at 20-21].

Plaintiff does submit a single piece of evidence in which defendants used the phrase "Park Ridge Falcons" instead of "Travel Falcons." [Dkt. #97, at 26; Dkt' #97-4, Pl. Ex. 56]. Plaintiff claims this is a Google description employed by the defendants, but does not provide a URL address for the "Google description." The exhibit plaintiff attaches shows that defendants did use the phrase "Park Ridge Falcons" in the body of the paragraph, but also that defendants put "From Park Ridge Travel Falcons", as opposed to simply "Park Ridge Falcons", in bold in the heading, and again in its first sentence. Plaintiff's showing on this factor, overall, is not strong.

**Similarity of the products**

As before, this factor cuts against the plaintiff. I previously found that the parties' offerings were different because defendants offer a program for "parents who want their boys to play a highly competitive tackle on a traveling team . . . ." Plaintiff objected to Judge Guzman that that finding was "simply not supported by the record." [Dkt. #61, at 10]. But Judge Guzman, reviewing that record *de novo*, found the objection did not even merit discussion. [Dkt. #68, at 9]. In this go-round, the difference remains. There is an elite level, D1 travel tackle team and a D2 "House level" local travel team. Plaintiff's local team plays in nearby suburbs [Dkt. #97-4, PRSI10767 (". . . community based travel football with neighboring towns . . . ")], but defendants' team really *travels*, playing in Indiana and Wisconsin, and in fact traveling to Florida for a tournament. [Dkt. #107, Def. Ex 8, at 56]. So, there is still a difference and, especially in the world of youth football, a significant one. As the plaintiff indicated when it still offered both teams, these are two very different levels, attracting two different levels of players. [Dkt. #97-4; Pl.Ex. 38]. If there were no difference between the parties' travel tackle football teams, then the plaintiff itself would not have referred to them as D1 and D2 "House level", would not have been concerned about the right level of players

for the two teams, and would not have made a point of telling the court that anyone can play on their D2 team – "you simply just have to sign up" – but players must try out for defendants' D1 team. [Dkt. #97, at 34]. Parents of boys at this age, especially parents of boys playing at the level of defendants' D1 travel team – the level where one must make the team – would not consider these two types of teams "closely related." *AutoZone, Inc. v. Strick*, 543 F.3d 923, 931 (7th Cir. 2008); *CAE, Inc. v. Clean Air Eng'g, Inc*., 267 F.3d 660, 680 (7th Cir. 2001). Indeed, the plaintiff concedes that such parents exercise a high degree of care in determining what type of team to sign their boys up for. [Dkt. #97, at 29].

**Area and manner of concurrent use**

This factor is a closer contest. Both sides offer their programs in Park Ridge among the same age group of boys. *Sorensen v. WD-40 Co.*, 792 F.3d 712, 730 (7th Cir. 2015)("... courts look at 'whether there is a relationship in use, promotion, distribution or sales between the goods or services of the parties' ... We also look to whether the parties use the same channels of commerce, target the same general audience, or use similar marketing procedures."). Plaintiff focuses on the fact that both parties promote their programs via social media platforms [Dkt. # 97, at 29], but that type of promotion is ubiquitous nowadays. *See Uncommon, LLC v. Spigen, Inc*., 926 F.3d 409, 426 (7th Cir. 2019). And, on the other hand, as before, the defendants' team plays a far-flung schedule, from the Wisconsin border through Northern Illinois and over the Indiana border. Plaintiff's program plays in Park Ridge and some closer, neighboring suburbs.

**Degree of care likely to be exercised by consumers**

Plaintiff concedes that this factor favors the defendants. [Dkt. #97, at 29("This factor does not favor confusion because the price point at which both parties offer their programs."]. The plaintiff, somewhat misguidedly and confusingly, bases this on "price point." This isn't a matter of choosing between cellphone cases, *Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409, 426 (7th Cir. 2019), or even speaker boxes. *S Indus., Inc. v. JL Audio, Inc*., 29 F. Supp. 2d 878, 892 (N.D. Ill. 1998). Here, parents are exercising their judgment for their children in selecting between two very different types of youth football programs. Even if the price point was very low, the difference between their sons having to try out for one team, and just show up for the other, necessarily leads to a high degree of discernment. The vast majority of football families – indeed, families involved in any youth sport – know the difference between a traveling team and a local team, or between a D1 team and a D2 team.

**Strength of the mark**

Plaintiff argues for the strength of its mark by again asserting that the evidence shows it has used it for 50 years and "because its fame, uniqueness, and volume of usage give it an edge in the marketplace." As to the first assertion, as already discussed, the evidence of 50 years of use is sketchy especially when viewed in context of the much more dominant use of Park Ridge and Mighty Mites. Again, there are one or two mentions, here and there, of "Falcons" in the hundreds of pages of programs and photos plaintiff has submitted. As for the second assertion, plaintiff's mark is anything but unique. In fact it is a copy and its use among youth football programs is commonplace. Third party registration and use detract from the strength of a mark. *CAE, Inc. v. Clean Air Eng'g, Inc*., 267 F.3d 660, 685 (7th Cir. 2001); *Am. Soc'y of Plumbing Engineers v. TMB*

*Pub., Inc.*, 109 F. App'x 781, 789 (7th Cir. 2004); *McGraw–Edison Co. v. Walt Disney Prods.*, 787 F.2d 1163, 1171 (7th Cir.1986). The more use and promotion of similar marks by third parties, the weaker the mark and less protection afforded. *See Plumbing Engineers*, 109 F. App'x at 789; *McGraw–Edison*, 787 F.2d at 1171. This factor, too, fails to tip the scales in plaintiff's favor.

**Actual confusion**

"[E]vidence of actual confusion must refer to the confusion of reasonable and prudent consumers," *Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.*, 149 F.3d 722, 729 (7th Cir. 1998), [Dkt. #68, at 7]. As before, there is some evidence of consumer confusion stemming from the use of the name "Falcons," but plaintiff's relevant evidence boils down to a handful of emails from mothers which, as Judge Guzman previously found, "is *de minimis*." A closer look at the evidence plaintiff relies upon this time around is not terribly convincing evidence of the defendants creating confusion. [Dkt. #97, at 31-32].

First, there is a facebook post on defendants' facebook page: "Is this the original Park Ridge football or the new one they just started. I'm so confused." The mom's question was cleared up immediately when defendants responded that it was travel football. [Dkt. #97-4, Pl.Ex. 60]. Notably, the mother made no mention of being confused by "Falcons"; she was confused, instead, by there being two teams in Park Ridge for the same boys' age group. It is the plaintiff that initiated those conditions back in 2019, when it decided to call not only its traditional traveling team the "Falcons", but its less competitive, local "House level" team the "Falcons" as well. At that time, plaintiff felt any potential confusion was alleviated by distinguishing the teams as D1 and D2. [Dkt. #97-4; Pl.Ex. 38]. Defendants have continued differentiating the teams in that or similar fashion. *See, e.g.,* [Dkt. #97-4, Pl.Exs. 47, 50, 51, 57, 58, 59].

There is a March 29, 2021 email from a mom to the plaintiff: "I'm so upset right now. I signed my son up to play Park Ridge Falcons football, this spring, with his friends. We are new to the area and want him to play for Park Ridge Falcons. Is there two different Falcons football organizations? I'm so upset because I think I was deceived and I registered him for a different league. . . . Is there any way to register him and get him on the correct team? I'm beyond upset that there are two teams in the same town with the same name. That is completely unacceptable and I do not want him to play on the other team." [Dkt. #97-4; Pl Ex. 61]. Being "new to the area," this parent is not the most convincing example of confusion. *Compare Toyota Motor Sales, U.S.A., Inc. v. Tabari*, 610 F.3d 1171, 1176 (9th Cir. 2010)(". . . the relevant consumer is a reasonably prudent consumer accustomed to shopping online; . . . inexperienced web-shoppers are not relevant."). More importantly, her complaint is that there are two teams with the same name in Park Ridge. Again, that is a circumstance that plaintiff created in 2019.

And there is an April 12, 2021 email from another mom. After finding out her son didn't make the defendants' traveling team, she asked if "park ridge falcons have a house league that [she] c[ould] get him into for the spring? . . . I wish it would have been made known that the team had tryouts and not everyone was going to make it. I invested in football cleats, mouth guard etc. and now I have no use for them. Unfortunately my son is 14 and will be in high school come this Fall. I have a really disappointed kid. Any idea of anywhere else I could sign him up? I should have know[n] when his friend kept saying things that didn't match where he was originally. Two of the same names and different leagues." [Dkt. #97-4, Pl.Ex. 62]. Again, the two-teams-same-name-same-town problem was plaintiff's original creation. And, this parent readily concedes that she was not prudent, ignoring any signs that she had made a mistake. The other couple of emails plaintiff

has submitted are along these same lines.

**Intent to "palm off"**

As it did a year ago, this factor goes against the plaintiff as well. "Passing off (or palming off, as it is sometimes called) occurs when a producer misrepresents his own goods or services as someone else's." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 27 n. 1 (2003). Plaintiff does not offer a high level, D1 travel program, having eliminated that program in the spring of 2020 and collapsing its football offerings into what had been a "House level" D2 team. Defendants are continuing to offer the higher level, D1 program with wider travel and better competition. The record suggests that they are intent on doing anything rather passing their offering off as plaintiff's offering. They have made clear that there are two levels of youth football, and theirs is the higher level, the traveling team that existed for years before plaintiff eliminated it. While both parties identify their teams with Park Ridge, that is not the trademark at issue here.

In conclusion, when all these factors are weighed and considered, and that is done under the stricter standard of *Pritzker* and *May*, it has to be said that, overall, the factors weigh against the plaintiff and that the plaintiff has not shown a likelihood of success on the merits, especially in view of the Seventh Circuit making it clear that more must be done than showing a "better than negligible" chance of success.

**Irreparable Harm**

All that being as it may, as this is merely a report and recommendation, the analysis will be to the next step. If the moving party gets past the initial threshold of showing it has some likelihood of success, it must then show that: (1) it will suffer irreparable harm in the period before the resolution of its claim. *HH-Indianapolis,* 889 F.3d at 437; *Girl Scouts of Manitou Council, Inc. v.*

*Girl Scouts of U.S. of Am., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). Plaintiff submits that, in the wake of the Trademark Modernization Act of 2020, 15 U.S.C. § 1116(a), it is entitled to a rebuttable presumption of irreparable harm upon "show[ing] that it has a better than negligible chance of succeeding on the merits, . . . ." [Dkt. #97, at 33]. As already indicated, plaintiff is operating under the standard the Seventh Circuit has explained as been retired. *Pritzker*, 973 F.3d at 763. So, that detracts from plaintiff's argument before one even gets to it.

Plaintiff also assumes that the Trademark Modernization Act, enacted on December 27, 2020, applies retroactively to cases that were already pending at that time and – more of a presumption – to cases which were not only pending but in which the plaintiff had already failed to convince a court it was entitled to a preliminary injunction. The traditional presumption runs against retroactive application. *See, e.g., Hamdan v. Rumsfeld*, 548 U.S. 557, 576 (2006)("If a statutory provision 'would operate retroactively' as applied to cases pending at the time the provision was enacted, then 'our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.'" (citing *Landgraf v. USI Film Products*, 511 U.S. 244, 280 (1994)); *Bowen v. Georgetown Univ. Hospital*, 488 U.S. 204, 208 (1988)("... congressional enactments... will not be construed to have retroactive effect unless their language requires this result."). Plaintiff supposes that Congress expressed its intent that application would be retroactive by indicating that the irreparable harm amendment to the Lanham Act "shall not be construed to mean that a plaintiff seeking an injunction was not entitled to a presumption of irreparable harm before the date of enactment of this Act." 15 U.S.C.A. § 1116(a). As the defendant argues, however, "[r]eading this language as saying Congress expressly intended the amendments to apply retroactively -- and saying that it would have been error for a court not to apply a presumption of irreparable harm

– stretches that language further than it can bear." [Dkt. #111, at 2]. If plaintiffs' interpretation were correct, every preliminary injunction in the country that had been denied (in cases still pending) would have to be re-done. That makes little sense, and plaintiff has not alerted the court to any examples of this.

But, even if that were the case, the presumption is a rebuttable one, and the circumstances at work here serve to counsel in favor of finding against the entry of a preliminary injunction. In the first go-round, Judge Guzman found that the evidence was contrary to plaintiff's claims of irreparable harm, especially given plaintiff's three-month delay in moving for a preliminary injunction. [Dkt. #68, at 10]. The situation is even less convincing this time around. As already noted, plaintiff makes any number of histrionic assertions about threats to its very existence if defendants are allowed to continue with their Park Ridge Travel Falcons program. But, in the nearly two years since plaintiff filed suit, those claimed "existential threats" have, obviously, not come to fruition. If they were so dire, surely plaintiff would have appealed Judge Guzman's original ruling. The additional evidence plaintiff has accumulated in the year and a half since Judge Guzman's original ruling provides little, if any, valid excuse for delay. Most of that evidence isn't "new"; for example, the hundreds of pages of programs and photos were at plaintiff's disposal the first time around. The more recent deposition testimony plaintiff cites does more to highlight the fact that defendants are continuing a program that plaintiff chose to eliminate than to demonstrate any harm to – or, indeed, any intent to harm -- the program plaintiff chose to continue. Significantly, courts that have allowed a rebuttable presumption of irreparable harm prior to the enactment of the Trademark Modernization Act have found far less delay to scuttle a claim of irreparable harm. *See, e.g., Two Hands IP LLC v. Two Hands Am., Inc*., 2021 WL 4437975, at *4 (S.D.N.Y.

25

2021)(collecting cases).

 If all that weren't enough, the trial in this matter is set for March 7, 2022. [Dkt. #106]. "The 'purpose of a preliminary injunction is merely to preserve the relative positions of the parties *until a trial on the merits can be held.*'" *Benisek v. Lamone*, _U.S._, 138 S. Ct. 1942, 1945 (2018)(quoting *University of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)(emphasis added)). Once the report and recommendation issues, Fed.R.Civ.P. 72 effects an automatic "delay" of about a month while objections are briefed. Then, Judge Guzman must consider the portions of the report and recommendation to which the parties objected *de novo*. In the context of *de novo* review, the report and recommendation is, essentially, irrelevant. As to the portions of the report and recommendation the parties do not object to, Judge Guzman must still review those for "clear error." All that, of course, necessarily takes time, and this case – about dads fighting over what nickname their children's football teams are called – is not Judge Guzman's only case and, we dare say, if my own docket is any guide, not his most important. Last time, even though Judge Guzman moved rather efficiently to deny plaintiff's motion for a preliminary injunction, his thorough review still required five weeks. [Dkt. ##66, 68]. All that adds up to there being a matter of a week or two, or perhaps even just several days, between a decision on plaintiff's second try for a preliminary injunction and the resolution of this dispute at trial. Whatever harm might occur in that exceedingly brief window of time between Judge Guzman's ruling and resolution of this squabble at trial would be far too inconsequential to merit the entry of the extraordinary remedy of a preliminary injunction. *Compare Benisek*, 138 S. Ct. at 945 ("Despite the District Court's undisputedly diligent efforts, however, that date had "already come and gone" by the time the court ruled on plaintiffs' motion.").

Plaintiff hopes to deflect the application of a little common sense in this situation by asserting that:

> football season does not end in the fall. Currently, Defendants are soliciting players for their spring football season. Accordingly, even with fall football season coming to an end, Defendants will still be actively involved in the market, causing Park Ridge Sports to further lose control over the reputation and goodwill of its Park Ridge Falcons mark.

[Dkt. #108, at 9]. But, that ignores the point that, again, it will be a matter of only a few days to a couple of weeks in which this purported harm will be taking place. And, according to plaintiff's evidence, if a boy doesn't make the D1 travel team, he can still sign up for the plaintiff's D2 offering. [Dkt. #97-4, Pl. Ex. 59].

One aspect of plaintiff's reputation plaintiff claims is being damaged is that it has never required tryouts for its team, whereas the defendants do. [Dkt. # 97, at 34]. According to the plaintiff, it always "had a no-cut policy, which meant the Park Ridge Falcons mark identified a travel tackle football program that never cut its players. [Dkt. #97, at 35]. Given the hundreds of pages of old programs and photos plaintiff submitted, that point is difficult to believe. The program had perhaps a dozen or so full teams, all going by various names copied from the NFL, but only one travel squad (or two, for two different age groups). Obviously, not every kid that "just signed up" got to play on the travel team. There had to have been some elimination process to assign higher level players to the travel team. Indeed, at least one piece of evidence from 2015 in the haystack plaintiff submitted completely undermines plaintiff's unsupported assertions to the court that were never tryouts for its traveling team. [Dkt. #97-3, PRSI15125 ("They also have the option of trying out for the Falcons, who play teams from other communities."); PRSI15128( ". . . many members of the house league will try out for the Falcons after developing their skills.")]. Even if this were

somehow not the case, it is difficult to see how the reputation of plaintiff having a no-cut team is hurt by defendants having a tryout team.

Another facet of plaintiff's reputation that plaintiff raises is its strict adherence to and enforcement of conduct rules. The example it provides – the only one – is that it suspended a coach for a single game for getting into a fight on the field during a youth program game. [Dkt. # 97, at 13]. Frankly, one game time-out as a sanction for an adult who mentors a group of boys and gets into a fight in front of them in the middle of one of their games is anything but "strict." And, certainly, it is weak evidence of a good reputation – if it is evidence at all.

Finally, the plaintiff asserts that the fact that it has a relationship with the local Park District such that the Park District allows it to use its fields and other facilities is further evidence of its good reputation. [Dkt. #97, at 13-14]. Again, that is difficult to see, unless the Park District has some exclusive policy that it exercises in favor of those with undefined, "good" reputations. How good does one's reputation have to be in order to have preferred access to a field or a clubhouse?

And so, we come to the upshot of all this, again, for the second time. Like much of the law, this preliminary injunction analysis is inexact and hardly a science. Motions for preliminary injunctions call upon courts to make judgments despite uncertainties. *Planned Parenthood of Indiana & Kentucky, Inc. v. Adams*, 937 F.3d 973, 980 (7th Cir. 2019). In the end, the decision whether to grant or deny a preliminary injunction is discretionary:

> "Once all the equitable factors are before the judge, however, a classic discretionary decision must be made involving how much weight to give individual components of the calculus and to what direction the balance of equity tips. . . . Ultimately, the district judge has to arrive at a decision based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case."

*Jones v. Markiewicz-Qualkinbush*, 842 F.3d 1053, 1060 (7th Cir. 2016)(quoting *Lawson Prods., Inc.*

*v. Avnet, Inc*., 782 F.2d 1429, 1436 (7th Cir. 1986)). Exercising my discretion based on the parties'

submissions and all of the considerations and factors detailed in the foregoing discussion, I

recommend that the plaintiff's motion for a preliminary injunction [Dkt.#96] be denied.[7]


**ENTERED:** _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 1-5-22

---

[7] Because I find that plaintiff has failed to make the required showing that it has some likelihood of succeeding on the merits of its case at trial and that it also has not shown it is likely will suffer irreparable harm (and, to the extent it is entitled to a rebuttable presumption of harm, the record rebuts the presumption), I do not continue with the next step, balancing of harms.